UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DAVE DESORMEAU,

                     Plaintiff,

                -against-

UNITED CEREBRAL PALSY, INC.,
KENNY STRONG, MARIA LOPEZ,
SHARON RICH, SHEENA PALMER,
and GIOVANNI LEONE,
(in their official and individual capacities
pursuant to NYEL §§290 *et seq.*),

                     Defendants.

-------------------------------------------------------------X

**CV: 17-7519**

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff, DAVE DESORMEAU, complaining of the Defendants, alleges as follows:

## PRELIMINARY STATEMENT

Plaintiff Dave Desormeau ("Plaintiff") brings this instant action pursuant to (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq.*, for Defendant United Cerebral Palsy's ("UCP") discrimination against Plaintiff; (2) the ADA, 42 U.S.C. §12203, *et seq.*, for UCP's retaliation against Plaintiff; (3) New York Executive Law ("NYEL") §290 *et seq.* against Defendant UCP, Kenny Strong ("Strong"), Maria Lopez ("Lopez"), Sharon Rich ("Rich"), Sheena Palmer ("Palmer"), and Giovanni Leone ("Leone"), (collectively referred to as "Defendants"), for their discriminatory treatment of Plaintiff due to his disability; (4) for Defendant UCP's, Defendant Strong's, Lopez's, and Palmer's retaliation against Plaintiff for engaging in protected activity due to Plaintiff's disability; (5) for the creation of a hostile work environment due to severe and pervasive harassment based on Plaintiff's disability.

## JURISDICTION

FIRST:    The jurisdiction of the Court over this controversy is based upon 28 U.S.C. § 1331 as this matter is raised under ADA §42 U.S.C. §12101, *et seq.*, and 42 U.S.C. §12203, *et seq.*

SECOND:    The Court also has supplemental jurisdiction over this case pursuant to 28 U.S.C. §1367(a), as Plaintiff's NYEL claims form part of the same case and controversy.

THIRD:    Therefore, this court has proper jurisdiction in this action

## VENUE

FOURTH:    The unlawful practices alleged below were committed within the County of Suffolk, State of New York.

FIFTH:    At the time of the unlawful practices, Plaintiff was, and still is, a resident of Suffolk County in the State of New York.

SIXTH:    The causes of action arose in the State of New York while Plaintiff was employed by Defendant UCP, who conducts substantial business in the County of Suffolk.

SEVENTH:    Therefore, this Court is the proper venue under 28 U.S.C. §1391.

## PARTIES

EIGHTH:    At all times relevant to this action, Plaintiff was and is an adult individual residing in the State of New York, County of Suffolk.

NINTH:    At all times relevant to this action, Plaintiff had a disability of Aquagenic Chronic Hives.

TENTH:    For Plaintiff, Aquagenic Chronic Hives involves uncontrollable itching, hives, and anxiety, and can be triggered by his anxiety.

ELEVENTH: Plaintiff is covered as a disabled person under the ADA due to this disability in that Aquagenic Chronic Hives is mental disability and physical disability as per the ADA's definitions, and, as a result, affects major life activities for Plaintiff.

TWELFTH: Aquagenic Chronic Hives is a physical disability in that it creates hives on Plaintiff's body, and a mental disability in that it causes him to undergo anxiety.

THIRTEENTH: Aquagenic Chronic Hives affects the major life activities of Plaintiff in that it affects his ability to perform manual tasks due to uncontrollable itching, and it affects his ability to concentrate due to anxiety.

FOURTEENTH: At all times relevant to this action, Plaintiff was an "employee" of Defendant UCP as defined by the ADA and NYEL.

FIFTEENTH: At all times relevant to this action, Defendant UCP was an "employer" as defined by the ADA and NYEL.

SIXTEENTH: At all times relevant to this action, Plaintiff was an individual employed by Defendant UCP.

SEVENTEENTH: At all times relevant to this action, Plaintiff was able to successfully complete all the essential functions that were required of him at Defendant UCP.

EIGHTEENTH: Defendant UCP is a group home for developmentally disabled adults, and is located at 250 Marcus Boulevard, Hauppauge, New York 11788.

NINETEENTH: The discriminatory and retaliatory actions of Strong, Lopez, Rich, Palmer, and Leone, as demonstrated by countless fabricated write-ups of Plaintiff, as well as UCP's inaction, as demonstrated by a failure to discipline any employee that harassed Plaintiff, gives rise to the inference of unlawful conduct against Plaintiff at Defendant UCP.

TWENTIETH: At all times relevant to this action, Strong was a supervisor at Defendant UCP and had the authority to hire, fire, and discipline employees.

TWENTY-FIRST: Strong had the power to do more than carry out personnel decisions made by others and is thereby individually liable for his discriminatory treatment, retaliatory treatment and adverse actions against Plaintiff.

TWENTY-SECOND: Strong acted with the understanding that his actions violated clearly established legal rights of Plaintiff.

TWENTY-THIRD: Strong aided, abetted, incited, controlled, compelled, and/or coerced the acts against Plaintiff that are forbidden under the ADA and NYEL.

TWENTY-FOURTH: Strong actually participated in the conduct giving rise to Plaintiff's discrimination and retaliation claims and is thereby individually liable for his willful, wanton and malicious discriminatory and retaliatory treatment against Plaintiff pursuant to the ADA and NYEL.

TWENTY-FIFTH: Strong is named in his individual capacity because he knew, or should have known, that his and Defendant UCP's ongoing/continuous willful and malicious actions against Plaintiff violated his clearly established constitutional and statutory rights, of which a reasonable person would have known that Plaintiff's rights were being violated. As a result Strong has waived his qualified immunity.

TWENTY-SIXTH: The contour of Plaintiff's right not to be discriminated against due to his disability, not be retaliated against due to his involvement in protected activity and not be treated adversely as compared to his similarly situated co-workers, is sufficiently clear that a reasonable official, such as Strong, should have known that his actions violated Plaintiff's rights.

TWENTY-SEVENTH:     Strong arbitrarily, selectively and with malicious intent discriminated against Plaintiff based on his disability and retaliated against Plaintiff based on Plaintiff's involvement in protected activity.

TWENTY-EIGHTH:     At all times relevant to this action, Maria Lopez was a direct supervisor to Plaintiff at Defendant UCP and had the authority to hire, fire, and discipline employees.

TWENTY-NINTH:  Lopez had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment, retaliatory treatment and adverse actions against Plaintiff.

THIRTIETH:     Lopez acted with the understanding that her actions violated clearly established legal rights of Plaintiff.

THIRTY-FIRST:     Lopez aided, abetted, incited, controlled, compelled, and/or coerced the acts against Plaintiff that are forbidden under the ADA and NYEL.

THIRTY-SECOND: Lopez actually participated in the conduct giving rise to Plaintiff's discrimination and retaliation claims and is thereby individually liable for her willful, wanton and malicious discriminatory and retaliatory treatment against Plaintiff pursuant to the ADA and NYEL.

THIRTY-THIRD:     Lopez is named in her individual capacity because she knew, or should have known, that her and Defendant UCP's ongoing/continuous willful and malicious actions against Plaintiff violated his clearly established constitutional and statutory rights, of which a reasonable person would have known that Plaintiff's rights were being violated. As a result Lopez has waived her qualified immunity.

THIRTY-FOURTH: The contour of Plaintiff's right not to be discriminated against due to his disability, nor retaliated against due to Plaintiff's involvement in protected activity, and not be treated adversely as compared to his similarly situated co-workers, is sufficiently clear that a reasonable official, such as Lopez, should have known that her actions violated Plaintiff's rights.

THIRTY-FIFTH: Lopez arbitrarily, selectively and with malicious intent discriminated against Plaintiff based on his disability and retaliated against Plaintiff due to his engagement in protected activity.

THIRTY-SIXTH: At all times relevant to this action, Sheena Palmer was a manager at Defendant UCP and had the authority to hire, fire, and discipline employees.

THIRTY-SEVENTH: Palmer had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment, retaliatory treatment and adverse actions against Plaintiff.

THIRTY-EIGHTH: Palmer acted with the understanding that her actions violated clearly established legal rights of Plaintiff.

THIRTY-NINTH: Palmer aided, abetted, incited, controlled, compelled, and/or coerced the acts against Plaintiff that are forbidden under the ADA and NYEL.

FORTIETH: Palmer actually participated in the conduct giving rise to Plaintiff's discrimination and retaliation claims and is thereby individually liable for her willful, wanton and malicious discriminatory and retaliatory treatment against Plaintiff pursuant to the ADA and NYEL.

FORTY-FIRST: Palmer is named in her individual capacity because she knew, or should have known, that her and Defendant UCP's ongoing/continuous willful and malicious actions against Plaintiff violated his clearly established constitutional and statutory rights, of

which a reasonable person would have known that Plaintiff's rights were being violated. As a result Palmer has waived her qualified immunity.

FORTY-SECOND: The contour of Plaintiff's right not to be discriminated against due to his disability, nor retaliated against due to Plaintiff's involvement in protected activity, and not be treated adversely as compared to his similarly situated co-workers, is sufficiently clear that a reasonable official, such as Palmer, should have known that her actions violated Plaintiff's rights.

FORTY-THIRD: Palmer arbitrarily, selectively and with malicious intent discriminated against Plaintiff based on his disability and retaliated against Plaintiff due to his engagement in protected activity.

FORTY-FOURTH: At all times relevant to this action, Leone had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment, retaliatory treatment and adverse actions against Plaintiff.

FORTY-FIFTH: Leone acted with the understanding that her actions violated clearly established legal rights of Plaintiff.

FORTY-SIXTH: Leone aided, abetted, incited, controlled, compelled, and/or coerced the acts against Plaintiff that are forbidden under the ADA and NYEL.

FORTY-SEVENTH: Leone actually participated in the conduct giving rise to Plaintiff's discrimination and retaliation claims and is thereby individually liable for his willful, wanton and malicious discriminatory and retaliatory treatment against Plaintiff pursuant to the ADA and NYEL.

FORTY-EIGHTH: Leone is named in her individual capacity because she knew, or should have known, that her and Defendant UCP's ongoing/continuous willful and malicious

actions against Plaintiff violated his clearly established constitutional and statutory rights, of which a reasonable person would have known that Plaintiff's rights were being violated. As a result Leone has waived her qualified immunity.

FORTY-NINTH:    The contour of Plaintiff's right not to be discriminated against due to his disability, not be retaliated against due to his involvement in protected activity and not be treated adversely as compared to his similarly situated co-workers, is sufficiently clear that a reasonable official, such as Leone, should have known that his actions violated Plaintiff's rights.

FIFTIETH:   Leone arbitrarily, selectively and with malicious intent discriminated against Plaintiff based on his disability and retaliated against Plaintiff based on Plaintiff's involvement in protected activity.

FIFTY-FIRST:    Leone aided, abetted, incited, compelled, and/or coerced the discrimination against Plaintiff based on his disability and retaliation against Plaintiff based on involvement in protected activity in violation of NYEL.

FIFTY-SECOND:    At all times relevant to this action, Rich had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment, retaliatory treatment and adverse actions against Plaintiff.

FIFTY-THIRD:    Rich acted with the understanding that her actions violated clearly established legal rights of Plaintiff.

FIFTY-FOURTH:    Rich aided, abetted, incited, controlled, compelled, and/or coerced the acts against Plaintiff that are forbidden under ADA and NYEL.

FIFTY-FIFTH:    Rich actually participated in the conduct giving rise to Plaintiff's discrimination and retaliation claims and is thereby individually liable for her willful, wanton

and malicious discriminatory and retaliatory treatment against Plaintiff pursuant to the ADA and NYEL.

FIFTY-SIXTH: Rich is named in her individual capacity because she knew, or should have known, that her and Defendant UCP's ongoing/continuous willful and malicious actions against Plaintiff violated his clearly established constitutional and statutory rights, of which a reasonable person would have known that Plaintiff's rights were being violated. As a result Rich has waived her qualified immunity.

FIFTY-SEVENTH: The contour of Plaintiff's right not to be discriminated against due to his disability, nor retaliated against due to Plaintiff's involvement in protected activity, and not be treated adversely as compared to his similarly situated co-workers, is sufficiently clear that a reasonable official, such as Rich, should have known that her actions violated Plaintiff's rights.

FIFTY-EIGHTH: Rich arbitrarily, selectively and with malicious intent discriminated against Plaintiff based on his disability and retaliated against Plaintiff due to his engagement in protected activity.

FIFTY-NINTH: Rich aided, abetted, incited, compelled, and/or coerced the discrimination against Plaintiff based on his disability and retaliation due to engagement in protected activity in violation of NYEL.

## FACTS

SIXTIETH: Plaintiff began his highly dedicated career with Defendant UCP on or about August 20, 2012, at Sheryl Crescent ("Crescent").

SIXTY-FIRST: Plaintiff was hired at Defendant UCP for the position of Direct Support for individuals to assist residents with activities of daily living.

SIXTY-SECOND: Upon being hired, Plaintiff advised Defendant UCP of his Aquagenic Chronic Hives, and openly discussed this disability when he worked at Crescent.

SIXTY-THIRD: Plaintiff's disability never impaired his ability to perform the essential responsibilities of his position as Direct Support, as he always completed his tasks.

SIXTY-FOURTH: In fact, Plaintiff received a positive performance evaluation from Defendant UCP's Manager named Dede, ("Dede") when Plaintiff first started working at Defendant UCP.

SIXTY-FIFTH: On Plaintiff's very first day, he was screamed at by Defendant Leone for no reason.

SIXTY-SIXTH: Plaintiff ignored Defendant Leone and continued to fulfill his position responsibilities. However, at their second encounter, Defendant Leone got into Plaintiff's face and told him he "wasn't completely there."

SIXTY-SEVENTH: This comment was one of the first references made to Plaintiff's disability, in terms of Plaintiff's anxiety.

SIXTY-EIGHTH: After this incident, Defendant Leone continued to discriminate against Plaintiff due to Plaintiff's disability by referencing his disability in front of others when Plaintiff was working with a deaf client.

SIXTY-NINTH: Defendant Leone approached Plaintiff, started harassing him, and told Plaintiff that he "talks to himself a lot", all while Plaintiff was working with a client.

SEVENTIETH: When Plaintiff asked Defendant Leone to stop, Defendant Leone simply responded, "he deaf," in regard to discussing Plaintiff's disability in front of a client.

SEVENTY-FIRST: On their fourth encounter, Plaintiff was administering medications and Defendant Leone approached him again and told him to help another client, even though

Plaintiff was clearly administering medications. Plaintiff advised Leone that he was administering medications and in response Leone threatened him and said that he was going to see her "bad side."

SEVENTY-SECOND:     At that point, Plaintiff asked Defendant Leone what bad side she was talking about. In response to his good faith inquiry, Defendant Leone then contacted Defendant UCP's then Supervisor Keith Monroe, ("Monroe") in an attempt to try and get him to reprimand Plaintiff for no legitimate business reason.

SEVENTY-THIRD: Plaintiff advised Monroe of Leone's malicious actions against him and the harassment she had been subjecting him to and asked Monroe if he could find out what she had against Plaintiff.

SEVENTY-FOURTH:     Monroe then had a few words with Leone, which caused Leone to leave Plaintiff alone.

SEVENTY-FIFTH:  On or about January 2015, Defendant UCP's former Manager Lori Scioli ("Scioli") interrupted Plaintiff during a conversation he was having with his co-worker named John Udaze ("Udaze") and said "you're crazy."

SEVENTY-SIXTH:  This was also a blatant reference to Plaintiff's disability as, upon information and belief, no other similarly situated non-disabled co-worker at Defendant UCP was ever referred to as "crazy."

SEVENTY-SEVENTH:     Plaintiff was not having a conversation with Scioli at that time nor was he referring to her during his conversation with Udaze.

SEVENTY-EIGHTH:     Scioli did this in order to harass Plaintiff due to his disability.

11

SEVENTY-NINTH: Plaintiff did not respond to Scioli and continued to perform his position responsibilities.

EIGHTIETH: On or about January 2015, Plaintiff was further harassed due to his disability during a CPR training at Crescent where the UCP Training Specialist Joel ("Joel") told Plaintiff that he was "sick" and then pointed his finger at his brain in front of all of Defendant UCP's staff.

EIGHTY-FIRST: Plaintiff did not respond to him and continued to finish the course for the CPR class.

EIGHTY-SECOND: Plaintiff was also suffering from harassment from Defendant Rich at this time, as she would always berate him for no reason, which was something Plaintiff's similarly situated co-workers were not subjected to.

EIGHTY-THIRD: Defendant Rich also fabricated a write-up for Plaintiff that asserted that Plaintiff committed "medication errors," even though Plaintiff had not made any error with medication that day.

EIGHTY-FOURTH: Scioli wrote Plaintiff one day saying he didn't clean feces in the Crescent downstairs bathroom, even though Plaintiff was not scheduled to work at the time that Scioli complained about.

EIGHTY-FIFTH: This was an attempt to set Plaintiff up for failure in retaliation due to Plaintiff's complaints towards Scioli that pertained to Defendant UCP, as Scioli was aware of Plaintiff's complaints.

EIGHTY-SIXTH: No other similarly situated non-disabled co-workers were treated in this manner for participating in the protected activity of formally complaining about being treated adversely by Defendant UCP's employees.

EIGHTY-SEVENTH:     At this time, Scioli was threatening to terminate Plaintiff with false write-ups that stated "final written warning."

EIGHTY-EIGHTH:  The harassment from Defendant Leone, Defendant Rich, and Scioli was clearly discriminatory treatment of Plaintiff due to his disability, and in Leone's case, retaliation due to formal complaints.

EIGHTY-NINTH:    This discriminatory harassment created a hostile work environment for Plaintiff, as he was constantly treated differently from his similarly situated co-workers who did not have disabilities, because Plaintiff had a disability.

NINETIETH: On or about July 2015, Defendant Strong replaced Monroe as Supervisor at Defendant UCP and had a meeting with Plaintiff.

NINETY-FIRST:     Prior to their meeting with the supervisor, Plaintiff wrote a letter pleading with Defendant UCP to stop the harassment being committed by Defendant Rich, Defendant Leone, and Scioli.

NINETY-SECOND: In July 2015, Plaintiff was the first person Defendant Strong came to when Plaintiff entered Crescent to work.

NINETY-THIRD:     Defendant Strong told Plaintiff to go outside and said "you have previous write-ups," to which Plaintiff advised Defendant Strong that they were false and that Defendant UCP's management was fabricating his performance in order to discriminate against Plaintiff based on his disability, and retaliate against Plaintiff due to his previous formal complaints.

NINETY-FOURTH: Defendant Strong told Plaintiff he knew about the complaint he made about the discrimination and hostile work environment so he said "we're trying to make

13

this a better place," but never addressed what was going to be done or what exactly he meant to stop the harassment against him.

NINETY-FIFTH:     This demonstrates that Defendant UCP was treating Plaintiff disparately due to his disability in that Defendant Strong acknowledged that Plaintiff was being treated differently.

NINETY-SIXTH:     Despite Defendant Strong advising that things should change positively for Plaintiff, things did not change at Defendant UCP as no real attempts were made to remedy Plaintiff's situation.

NINETY-SEVENTH:     Soon after Strong promised that things should change for the better for Plaintiff at Defendant UCP, Plaintiff advised Defendant Strong that Defendant Rich was using co-workers against Plaintiff by maliciously spreading false rumors pertaining to his job performance and falsely accusing him of wrong doing that could jeopardize his career at Defendant UCP.

NINETY-EIGHTH:  Plaintiff also complained that Defendant Rich treated Plaintiff differently even though he was performing his position responsibilities at the same level, and sometimes at a higher level than Plaintiff's similarly situated co-workers.

NINETY-NINTH:     Plaintiff always performed his responsibilities in a quality and timely manner, but when Defendant Rich felt that Plaintiff was not, she would tell him, "it's a mental thing."

ONE HUNDREDTH:     This was obviously in reference to Plaintiff's anxiety as a result of his disability of Aquagenic Chronic Hives, and thus was meant to harass and discriminate against Plaintiff due to his disability.

ONE HUNDRED FIRST:   No other similarly situated co-workers were told these things as a critique of their work, nor were they ever negatively critiqued when performing tasks adequately in general.

ONE HUNDRED SECOND:      Plaintiff also advised Defendant Strong that he was working in a hostile working environment and asked him for his help to stop the harassment against him.

ONE HUNDRED THIRD:   Plaintiff also complained to Defendant Strong that Plaintiff was being treated in a discriminatory fashion due to disability.

ONE HUNDRED FOURTH:      However, Defendant Strong would go on to never take these complaints seriously, as he made no effort to correct that harassment and adverse treatment Plaintiff was subjected to at Defendant UCP.

ONE HUNDRED FIFTH:   Defendants UCP, Strong, and Lopez were all aware of Plaintiff's diagnosed disability, as Plaintiff had made his disability known at the start of his employment and discussed it openly with Plaintiff's co-workers.

ONE HUNDRED SIXTH:   Plaintiff also advised Defendant UCP's Manager Dede of his diagnosed disability in which he was battling with and that Plaintiff had to take a prescription of 25mg of hydroxine, and a shot of xolair once a month.

ONE HUNDRED SEVENTH:      Defendant UCP's supervisors were even provided a doctor's note advising the same on or about September 1, 2015.

ONE HUNDRED EIGHTH: Still, Plaintiff was subjected to ongoing harassment, derogatory statements and frequent threats by Defendant UCP's employees due to his diagnosed disability.

ONE HUNDRED NINTH:   Again, Defendant UCP never punished any employee who treated Plaintiff poorly due to his disability, as evidence by Rich's discriminatory treatment of Plaintiff without consequence.

ONE HUNDRED TENTH:   On or about the summer of 2015, Plaintiff received a telephone call from Strong telling him he was being suspended until further notice due to allegations made against him by a co-worker.

ONE HUNDRED ELEVENTH:   After Defendant UCP's investigation, however, the allegations against him were determined to be false.

ONE HUNDRED TWELFTH:   Upon information and belief, this was another example of ongoing discrimination due to his diagnosed disability and retaliation against him due to his engagement in protected activity.

ONE HUNDRED THIRTEENTH:   Upon information and belief, no other similarly situated employees at Defendant UCP who were not disabled were accused falsely and suspended.

ONE HUNDRED FOURTEENTH: On September 1, 2015, Plaintiff presented a doctor's note to Defendant Strong.

ONE HUNDRED FIFTEENTH:   This note provided Plaintiff's actual disability diagnosis and also requested a reasonable accommodation for Plaintiff to be exempt from overnight shifts, due to their negative effect on Plaintiff's disability.

ONE HUNDRED SIXTEENTH:   Defendant Strong criticized Plaintiff's performance in ways that were not true and told him that he performed poorly during the overnight shift anyway according to Plaintiff's write-ups.

ONE HUNDRED SEVENTEENTH:     Plaintiff responded by advising Defendant Strong that he was working hard and that the write-ups against him were completely fabricated and in retaliation of his record of diagnosed disability and formal complaints.

ONE HUNDRED EIGHTEENTH:  Plaintiff believed that Defendant Strong was looking for Plaintiff to challenge him and thereby become insubordinate, so that Defendant Strong could take further action against Plaintiff.

ONE HUNDRED NINETEENTH:  Another example of Defendant UCP's discrimination and retaliation against Plaintiff due to his diagnosed disability and engagement in protected activity occurred on or about September 2015, when Plaintiff arrived at Defendant UCP for his scheduled shift and Defendant Strong was waiting for him at the door so that he could immediately suspend Plaintiff for Five (5) days for allegedly not cutting a sandwich all the way the through.

ONE HUNDRED TWENTIETH:     The sandwich was in fact cut into Twelve (12) pieces but Defendant Strong took a photograph of it and said it wasn't cut all the way through on the other side.

ONE HUNDRED TWENTY-FIRST:     Defendant Strong then willfully and in direct retaliation of Plaintiff's treating physician's diagnosed disability and reasonable accommodation request, suspended Plaintiff for five (5) days.

ONE HUNDRED TWENTY-SECOND:     This was purely motivated by discriminatory and retaliatory intent.

ONE HUNDRED TWENTY-THIRD:     Upon information and belief, other similarly situated co-workers who were not disabled were not disciplined for failing to cut sandwiches the whole way through.

ONE HUNDRED TWENTY-FOURTH: Defendant Strong demonstrated further disparate treatment towards Plaintiff and ongoing unwarranted harassment against him, when Plaintiff followed Defendant UCP's procedures and requested his earned vacation time.

ONE HUNDRED TWENTY-FIFTH: Despite following said procedures and actually confirming coverage of his position responsibilities during his earned vacation leave, Defendant Strong gave Plaintiff a difficult time and told Plaintiff that he could not take his earned vacation leave, without giving a legitimate reason.

ONE HUNDRED TWENTY-SIXTH: Upon information and belief, no other similarly situated co-worker who was not disabled was ever refused vacation time for no legitimate reason, after correctly following the procedures to take vacation time.

ONE HUNDRED TWENTY-SEVENTH: Defendant Strong never questioned other similarly situated co-workers vacation time, and furthermore, never forbade them from taking it when all policies were followed correctly, further demonstrating his discriminatory treatment of Plaintiff due to Plaintiff's disability and retaliatory treatment of Plaintiff due to Plaintiff's formal complaints.

ONE HUNDRED TWENTY-EIGHTH: Defendant Strong finally approved Plaintiff's vacation but scolded Defendant's Assistant Manager, Towanda Bryant ("Bryant") for helping Plaintiff secure his earned leave.

ONE HUNDRED TWENTY-NINTH: On or about March 2016, Defendant UCP transferred its Manager, Defendant Palmer, who worked in a previous home, to work at Crescent.

ONE HUNDRED THIRTIETH: Upon information and belief, Defendant UCP advised Palmer of the fabricated allegations against Plaintiff so that she could aid and abet in Defendant UCP's upcoming discriminatory and retaliatory wrongful termination Plaintiff.

ONE HUNDRED THIRTY-FIRST: In March 2016, Defendant UCP subjected Plaintiff to even more disparate treatment when Plaintiff, and Renasia Williams ("Williams"), a similarly situated co-worker at UCP who was not disabled, both wore sandals to work at Defendant UCP.

ONE HUNDRED THIRTY-SECOND:     Defendant Palmer was looking for a reason to arbitrarily discipline Plaintiff, but could not do so because Williams was also wearing sandals.

ONE HUNDRED THIRTY-THIRD:     In order to further the discriminatory actions against Plaintiff due to his disability, and the retaliatory actions against Plaintiff due to his formal complaints, Defendant Palmer told Williams not to wear sandals so that Defendant Palmer could, "get Dave" for wearing them.

ONE HUNDRED THIRTY-FOURTH:     Williams was shocked by this attempt of adverse treatment, and told Plaintiff shortly after.

ONE HUNDRED THIRTY-FIFTH: This was another example of pure discriminatory and retaliatory treatment against Plaintiff, as Defendant Palmer was looking for reasons to treat Plaintiff differently because of Plaintiff's disability, and because Plaintiff had formally complained.

ONE HUNDRED THIRTY-SIXTH:     Williams, who was not disabled, would not have been given disciplinary action for wearing sandals, and was in fact, told to collude with Defendant Palmer, so that Plaintiff could be treated even more adversely.

ONE HUNDRED THIRTY-SEVENTH:     In fact this shows that no other similarly situated employee at Defendant UCP would normally get in trouble for wearing sandals to work, as Defendant Palmer only enforced the rule when Plaintiff wore sandals to work.

ONE HUNDRED THIRTY-EIGHTH:     At this point, Plaintiff turned to Defendant UCP's Human Resources ("HR") department to help remedy his situation.

ONE HUNDRED THIRTY-NINTH: Plaintiff wrote a letter to Defendant UCP's HR department that pertained to Strong's, Palmer's, and Rich's discriminatory and retaliatory treatment of Plaintiff.

ONE HUNDRED FORTIETH: As a result of this letter, Michelle Birdie ("Birdie") telephoned Plaintiff to speak about this treatment.

ONE HUNDRED FORTY-FIRST: Plaintiff told Birdie about the discriminatory and retaliatory treatment that he was being subjected to, but Birdie ignored Plaintiff's complaints, as Strong, Palmer, and Rich were never investigated nor reprimanded.

ONE HUNDRED FORTY-SECOND: This represents further discrimination against Plaintiff at Defendant UCP in that no other similarly situated non-disabled co-worker had their complaints to HR outright ignored.

ONE HUNDRED FORTY-THIRD: On or about June 9, 2016, Plaintiff formally complained to Defendant Strong about being discriminated against due to disability, and retaliated against due to Plaintiff's formal complaints.

ONE HUNDRED FORTY-FOURTH: During this meeting, Plaintiff also told Defendant Strong that because of the discriminatory treatment and retaliatory treatment, along with Plaintiff's diagnosed disability, that Plaintiff received a doctor's note that requested a reasonable accommodation of being exempt from administering medications to Defendant UCP's clients.

ONE HUNDRED FORTY-FIFTH: Other similarly situated co-workers could perform this task, so no undue burden would be placed on Defendant UCP, nor the individuals in Defendant UCP's care.

ONE HUNDRED FORTY-SIXTH: At no time did Plaintiff simply refuse, with no legitimate reason, to administer medications at Defendant UCP.

ONE HUNDRED FORTY-SEVENTH: In an act of discrimination due to Plaintiff's disability and retaliation due to Plaintiff's formal complaints, Defendant Strong refused Plaintiff's reasonable accommodation request.

ONE HUNDRED FORTY-EIGHTH: Upon information and belief, Defendant Strong refused so that Plaintiff would make a mistake while administering medications, so that Defendant Strong could continue to discriminate against Plaintiff due to his disability, and retaliate against Plaintiff due to his formal complaints.

ONE HUNDRED FORTY-NINTH: As a result of Defendant Strong's willful discrimination and retaliation against Plaintiff through denying Plaintiff the reasonable accommodation requests, Plaintiff presented the same reasonable accommodation requests and solutions to Defendant Lopez.

ONE HUNDRED FIFTIETH: Defendant Lopez refused both of Plaintiff's reasonable accommodation requests as well, and told Plaintiff she did not care.

ONE HUNDRED FIFTY-FIRST: Defendant Lopez then further retaliated against Plaintiff for his engagement in protected activity by telling him that he must administer medications, and that he would be immediately fired for making a mistake, even though this was the exact thing Plaintiff was trying to avoid.

ONE HUNDRED FIFTY-SECOND: Defendant UCP could have easily had someone else administer medications. Defendant UCP, however, refused Plaintiff the accommodations knowing that Plaintiff was more likely to make a mistake, and that, as a result

of that higher probability, there was also a better chance of treating Plaintiff adversely if he did make a mistake.

ONE HUNDRED FIFTY-THIRD:   These actions were motivated by a discriminatory animus due to Plaintiff's disability, and a retaliatory animus due to Plaintiff's engagement in protected activity.

ONE HUNDRED FIFTY-FOURTH:       Defendant Strong further retaliated against Plaintiff for engaging in protected activity on June 9, 2016, when he gave unwarranted, fabricated, corrective action to Plaintiff that stated on June 9, 2016, "Dave refused to administer medication and told his manager he was not doing meds."

ONE HUNDRED FIFTY-FIFTH:   This was a complete fabrication of the truth and carried out by Defendant Strong with the willful intent to harm Plaintiff's highly dedicated career at Defendant UCP.

ONE HUNDRED FIFTY-SIXTH:   However, without stating any undue burden to Defendant UCP, Defendant Strong's corrective action stated that another employee must administer medications because Plaintiff was too inadequate to complete the task.

ONE HUNDRED FIFTY-SEVENTH:       This shows that Defendant UCP could have easily provided Plaintiff with his reasonable accommodation request, but, in an act of discrimination due to Plaintiff's disability, and retaliation due to Plaintiff's formal complaints, refused to do so.

ONE HUNDRED FIFTY-EIGHTH: This statement completely ignored Plaintiff's disability, and provided the same solution as Plaintiff's reasonable accommodation request. Defendant Strong wanted to discriminate and retaliate against Plaintiff even more, so he used Plaintiff's reasonable accommodation request as a punishment.

ONE HUNDRED FIFTY-NINTH: This further demonstrates the adverse discriminatory action against Plaintiff due to his disability, and retaliatory action due to his participation in protected activity, as Defendant UCP was completely unwilling to provide a necessary and reasonable accommodation to Plaintiff, as recommended by a doctor, but was also willing to criticize and discipline Plaintiff for not being able to perform the same actions that the accommodation was needed for.

ONE HUNDRED SIXTIETH: Upon information and belief, no similarly situated co-worker that was not disabled was ever disciplined for not being able to perform responsibilities that they should be exempt from.

ONE HUNDRED SIXTY-FIRST: Upon information and belief, other employees at Defendant UCP were given reasonable accommodations, where Plaintiff was not.

ONE HUNDRED SIXTY-SECOND: Then in a series of adverse actions against Plaintiff, and pure harassment, on or about June 10, 11, 15, 16, 17, 18, of 2016, Defendant Strong continued to falsely write-up Plaintiff for not administering medications, with the full knowledge that it was directly due to his diagnosed disability.

ONE HUNDRED SIXTY-THIRD: Defendant Strong further stated, once again, without stating any undue burden to Defendant, that another employee had to administer medications because Plaintiff could not perform the task correctly, further demonstrating pure animus towards Plaintiff and charged Plaintiff with failure to perform his assigned job duties and insubordination.

ONE HUNDRED SIXTY-FOURTH: Between these dates, Plaintiff had ongoing reasonable accommodation conversations with Defendants Palmer, Strong and Lopez about his diagnosed disability and ongoing discrimination and retaliation he was being subjected to.

ONE HUNDRED SIXTY-FIFTH:   On June 11, 2016, Defendant Strong telephoned Crescent and asked to speak with Plaintiff about administering medications, but made no mention of his diagnosed disability or reasonable accommodation requests.

ONE HUNDRED SIXTY-SIXTH:   Again, Defendant Strong denied Plaintiff's solution due to his diagnosed disability.

ONE HUNDRED SIXTY-SEVENTH:      Plaintiff advised Defendant Strong during their conversation that his similarly situated co-worker, Raphael ("Raphael"), was administering medications at the same time that Plaintiff was scheduled, and that Raphael could administer medications to Plaintiff's individuals as well.

ONE HUNDRED SIXTY-EIGHTH:      Defendant Strong refused this accommodation.

ONE HUNDRED SIXTY-NINTH:  Upon information and belief, Defendant Strong did this so he could continue harassing, discriminating against, and retaliating against Plaintiff.

ONE HUNDRED SEVENTIETH:   Plaintiff pleaded with Defendant Strong to stop the harassment against him and asked Defendant Strong why he treated Plaintiff so poorly.

ONE HUNDRED SEVENTY-FIRST:   However, Defendant Strong ignored Plaintiff and continued his discriminatory and retaliatory behavior.

ONE HUNDRED SEVENTY-SECOND:   Again, there were never any issues with Plaintiff's similarly situated co-workers administering his medications for others, which clearly demonstrated disparate treatment against Plaintiff by Defendant UCP due to his diagnosed disability.

ONE HUNDRED SEVENTY-THIRD:   Defendant Strong continued his discriminatory harassment of Plaintiff soon after this when Defendant Strong, upon information

and belief, ordered Bryant to "watch," or over supervise Plaintiff whenever Plaintiff was scheduled to work at Defendant UCP.

ONE HUNDRED SEVENTY-FOURTH:    Defendant Strong had Bryant do this to put pressure on Plaintiff, and to over supervise Plaintiff so that Defendant Strong could continue to discriminate and retaliate against Plaintiff for anything Plaintiff did.

ONE HUNDRED SEVENTY-FIFTH:    No other similarly situated co-workers at Defendant who were not disabled were ever over supervised in this manner.

ONE HUNDRED SEVENTY-SIXTH:    On Defendant's June 15, 2016, write-up against Plaintiff, it stated that Plaintiff was administering medications until he told Defendant Lopez that he was not going to administer medications.

ONE HUNDRED SEVENTY-SEVENTH:  This was another fabrication motivated with discriminatory animus, as Lopez spoke with Plaintiff and said that Defendant UCP's Management understood he was having trouble with meds, so Defendant UCP scheduled Plaintiff to come in to her office to so that Plaintiff could talk to her before his shift started.

ONE HUNDRED SEVENTY-EIGHTH:    At no time did Plaintiff ever state that he was not administering medications to Defendant UCP's management on June 15, 2016, because Plaintiff was under the impression that Defendant UCP was aware of his disability, as was told to him by Defendant Lopez over the telephone.

ONE HUNDRED SEVENTY-NINTH:    This was clearly another lie to set up Plaintiff for failure.

ONE HUNDRED EIGHTIETH:    On June 16, 2016, Plaintiff met with Defendant Lopez and Sadowski ("Sadowski") to formally complain.

ONE HUNDRED EIGHTY-FIRST: Defendant Lopez and Sadowski brought Plaintiff into a closed room and asked what the issue was, to which Plaintiff explained in detail, once again, his diagnosed disability, reasonable accommodation request and fabricated write-ups.

ONE HUNDRED EIGHTY-SECOND: In response Defendant Lopez told Plaintiff, "we're not here to talk about that," effectively ignoring all of Plaintiff's complaints.

ONE HUNDRED EIGHTY-THIRD: Plaintiff then asked Defendant Lopez about what she was going to do in regard to Defendant UCP's supervisor being out to get him.

ONE HUNDRED EIGHTY-FOURTH: Instead of taking Plaintiff seriously, Lopez responded that Plaintiff, "had no witnesses," in a threatening manner.

ONE HUNDRED EIGHTY-FIFTH: Plaintiff's formal complaints, however, were ignored, as Defendant Lopez did not take Plaintiff's issues seriously.

ONE HUNDRED EIGHTY-SIXTH: On June 17, 2016, Williams was able to administer Plaintiff's medications, as it was never a problem for Plaintiff and his co-workers to switch assignments and have another coworker administer Plaintiff medications.

ONE HUNDRED EIGHTY-SEVENTH: Plaintiff performed Williams's laundry and kitchen duties, while Williams administered medications, so the job duties of the shift were completed in their entirety without any issues.

ONE HUNDRED EIGHTY-EIGHTH: This shows that if Defendant had granted Plaintiff's reasonable accommodation request, there would have been no undue burden suffered by Defendant UCP.

ONE HUNDRED EIGHTY-NINTH: However, Defendant Strong still asserted Plaintiff must administer medications so that he could continue to discriminate and retaliate against Plaintiff, with the goal of terminating him.

ONE HUNDRED NINETIETH:   On June 18, 2016, Williams administered medications to Plaintiff's patients without a problem, just as the day before.

ONE HUNDRED NINETY-FIRST: On June 18, 2016, Raphael also administered medications while he was scheduled to work a "double-shift" for Defendant UCP.

ONE HUNDRED NINETY-SECOND:    However, at the end of the day Defendant UCP fabricated more allegations against Plaintiff when they said that there was a, "delay in receiving meds, and extra staff had to come administer the meds."

ONE HUNDRED NINETY-THIRD:    This is untrue, in that both Williams and Raphael, the people who administered medications, were already scheduled for shifts that day.

ONE HUNDRED NINETY-FOURTH:    This is another example of pure discrimination against Plaintiff due to his disability and retaliation against Plaintiff for his formal complaints by in that Defendant UCP was continuing to create false allegations against Plaintiff in order to harass, and eventually terminate him.

ONE HUNDRED NINETY-FIFTH: No other similarly situated non-disabled co-worker had false allegations filed against them at Defendant UCP.

ONE HUNDRED NINETY-SIXTH:    Defendant UCP committed the ultimate adverse action against Plaintiff, and terminated Plaintiff on June 26, 2016, with the pretext that he would not administer medications.

ONE HUNDRED NINETY-SEVENTH:    Plaintiff's termination letter stated that he was terminated due to the inability to administer medications, and that extra staff had to be brought to Crescent to perform this task, as the previous fabricated allegations asserted.

ONE HUNDRED NINETY-EIGHTH:     This statement is untrue in that Williams was able to administer medications for Plaintiff when she had a shift scheduled at the same time as Plaintiff, thus no additional staff had to be brought to Crescent.

ONE HUNDRED NINETY-NINTH:     It is crystal clear based on the totality of circumstances that Defendant's ultimate adverse action against him was directly due to his record of diagnosed disability and reasonable accommodation request.

TWO HUNDREDTH:     Plaintiff timely filed a written charge asserting discrimination and retaliation based on disability within three hundred (300) days of the discrimination and retaliation with Equal Employment Opportunity Commission ("EEOC").

TWO HUNDRED FIRST:   Plaintiff received a Right to Sue letter from the EEOC on or about September 29, 2017.

TWO HUNDRED SECOND:     Plaintiff has filed this action prior to the expiration of ninety (90) days after receiving his Notice of Right to Sue from the EEOC.

**WHEREFORE,** Plaintiff demands judgment against the Defendants as follows,

1. For a money judgment representing actual damages for United Cerebral Palsy's discrimination against Plaintiff due to his disability in violation of ADA §42 U.S.C. §12101, *et seq.,* in an amount to be determined by a jury;

2. For a money judgment representing compensatory damages for United Cerebral Palsy's discrimination against Plaintiff due to his disability in violation of ADA §42 U.S.C. §12101, *et seq.,* in an amount to be determined by a jury;

3. For a money judgment representing emotional damages for United Cerebral Palsy's discrimination against Plaintiff due to his disability in violation of ADA §42 U.S.C. §12101, *et seq.,* in an amount to be determined by a jury;

4. For a money judgment representing actual damages for United Cerebral Palsy's retaliation against Plaintiff due to his disability in violation of ADA §42 U.S.C. §12203, *et seq.,* in an amount to be determined by a jury;

5. For a money judgment representing compensatory damages for United Cerebral Palsy's retaliation against Plaintiff due to his disability in violation of ADA §42 U.S.C. §12203, *et seq.,* in an amount to be determined by a jury;

6. For a money judgment representing emotional damages for United Cerebral Palsy's retaliation against Plaintiff due to his disability in violation of ADA §42 U.S.C. §12203, *et seq.,* in an amount to be determined by a jury;

7. For a money judgment representing actual damages for United Cerebral Palsy's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.,* in an amount to be determined by a jury;

8. For a money judgment representing compensatory damages for United Cerebral Palsy's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.,* in an amount to be determined by a jury;

9. For a money judgment representing emotional damages for United Cerebral Palsy's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.,* in an amount to be determined by a jury;

10. For a money judgment representing actual damages for United Cerebral Palsy's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

11. For a money judgment representing compensatory damages for United Cerebral Palsy's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

12. For a money judgment representing emotional damages for United Cerebral Palsy's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

13. For a money judgment representing actual damages for Strong's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

14. For a money judgment representing compensatory damages for Strong's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

15. For a money judgment representing emotional damages for Strong's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

16. For a money judgment representing actual damages for Strong's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

17. For a money judgment representing compensatory damages for Strong's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

18. For a money judgment representing emotional damages for Strong's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

19. For a money judgment representing actual damages for Lopez's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

20. For a money judgment representing compensatory damages for Lopez's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

21. For a money judgment representing emotional damages for Lopez's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

22. For a money judgment representing actual damages for Lopez's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

23. For a money judgment representing compensatory damages for Lopez's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

24. For a money judgment representing emotional damages for Lopez's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

25. For a money judgment representing actual damages for Rich's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

26. For a money judgment representing compensatory damages for Rich's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

27. For a money judgment representing emotional damages for Rich's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

28. For a money judgment representing actual damages for Palmer's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

29. For a money judgment representing compensatory damages for Palmer's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

30. For a money judgment representing emotional damages for Palmer's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

31. For a money judgment representing actual damages for Palmer's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

32. For a money judgment representing compensatory damages for Palmer's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

33. For a money judgment representing emotional damages for Palmer's retaliation against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

34. For a money judgment representing actual damages for Leone's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

35. For a money judgment representing compensatory damages for Leone's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

36. For a money judgment representing emotional damages for Leone's discrimination against Plaintiff due to his disability in violation of NYEL § 290 *et seq.*, in an amount to be determined by a jury;

37. For equitable and injunctive relief;

38. For reasonable attorney's fees and costs; and

39. For all other relief as the Court may deem just and proper.

## JURY DEMAND

**Plaintiff hereby demands a trial by jury for all issues in this action.**

Dated: Islandia, New York
      December 27, 2017

**SCOTT MICHAEL MISHKIN, P.C.**

By:    /s/ Scott Michael Mishkin

        Scott Michael Mishkin, Esq.
        One Suffolk Square, Suite 240
        Islandia, New York 11749
        Telephone: 631-234-1154
        Facsimile: 631-234-5048
        *Attorneys for Plaintiff*